UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


PNC BANK, NATIONAL ASSOCIATION,

       Plaintiff,

v.                                 Case No. 8:08-cv-611-T-24TGW

BRANCH BANKING AND TRUST
COMPANY,

       Defendant.

_____/

## ORDER

This matter came before the Court on a non-jury trial that was held February 23-25, 2010.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. After considering all of

the evidence, the deposition designations and cross-designations, the pleadings filed by the

parties, the arguments made by counsel, and the legal authorities submitted to the Court, the

Court makes the following findings of fact and conclusions of law.  To the extent that any of the

findings of fact might constitute conclusions of law, they are adopted as such.  Conversely, to the

extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I.  Findings of Fact[1]

Plaintiff PNC Bank ("PNC") is the successor to Mercantile Mortgage Corporation.  (SF

#1).  Defendant Branch Banking & Trust Company is the successor-in-interest to certain assets

---

[1]Stipulated Facts ("SF") can be found in the parties' Pretrial Statement (Doc. No. 63).
References to the trial exhibits are as follows: J-# refers to the parties' joint exhibits, P-# refers
to Plaintiff's exhibits, and D-# refers to Defendant's exhibits.
    Attached to this Order are three exhibits created by the Court to explain certain
calculations within this Order.  The information in these exhibits comes from evidence admitted
during the trial, including J-55.

of Colonial Bank ("Colonial").  (SF #3).  Throughout this Order, the Court will refer to Plaintiff as PNC and Defendant as Colonial.

This lawsuit arises out of a loan participation agreement ("Participation Agreement") entered into in August of 2006 by James Bange[2] of Colonial and John Long[3] of PNC.  (SF #5; SF #8; J-6).  The Participation Agreement related to a $36.5 million loan made by Colonial to Venetian Bay of New Smyrna Beach, LLC ("Venetian Bay") to fund Venetian Bay's construction of the Venetian Bay residential development community.  (J-1, J-6). The two main issues in this case relate to Colonial's failure to administer the parties' participation in the loan on a LIFO basis (as required by the Participation Agreement) and the use of the loan proceeds by Venetian Bay to pay for golf course expenditures.

### Administration of the Parties' Participation in the Loan

The underlying loan agreement between Colonial and Venetian Bay is similar to a line of credit, in that the balance of the loan was constantly changing.  The loan balance would increase when Venetian Bay drew upon the loan and would decrease when Venetian Bay made periodic principal repayments after it sold its lots to builders.

The Participation Agreement provided that PNC would fund all loan amounts made by Colonial to Venetian Bay in excess of $26.5 million, up to a maximum amount of $10 million.  Specifically, paragraph 6 of the Participation Agreement provides the following:

> The theory of this Participation Agreement between these parties is that
> [Colonial] shall fund the first $26,500,000.00, and [PNC] shall fund all amounts

---

[2]James Bange was a senior lender at Colonial at the time.  (SF #8).

[3]John Long was the Senior Vice President of Mercantile, PNC's predecessor at the time. (SF #8).

above $26,500,000.00. All principal payments from [Venetian Bay] shall be paid
to [PNC] until the outstanding loan balance is paid down to $26,500,000.00, and
thereafter, all principal payments shall be retained by [Colonial].

(J-6). This manner of funding–where PNC funds 100% of all amounts in excess of $26.5 million

and is paid 100% of all amounts collected by Colonial as long as PNC has an outstanding loan

balance–is referred to as a LIFO loan.[4]

Pursuant to Paragraph 14 of the Participation Agreement, Colonial was the "lead" bank,

responsible for the collection, management, and administration of the loan. As such, Colonial

directly funded Venetian Bay's draw requests, and then Colonial sought funding from PNC for

its participation in the funding. This funding procedure was set forth in Paragraph 6 of the

Participation Agreement, which provides that when Venetian Bay made a draw on the loan,

Colonial was required to give PNC a funding request for the amount of PNC's participation

(along with notice that all conditions precedent to the funding had been satisfied), and then PNC

was required to wire the funds to Colonial within three days. (J-6).

Venetian Bay made principal repayments directly to Colonial. Paragraph 16 of the

Participation Agreement provides that when Venetian Bay made a principal repayment, Colonial

was required to pay PNC 100% of the amounts collected until PNC's outstanding balance was

reduced to zero, and Colonial was required to make such remittance within two business days

after it received the money from Venetian Bay. (J-6).

Under Paragraphs 7 and 8 of the Participation Agreement, PNC was obligated to fund all

---

[4]LIFO stands for "last in, first out," meaning that the last dollars put in to fund the loan
are the first dollars repaid when amounts are collected from the borrower. By comparison, a
revolving loan administered on a pro rata basis, or pari passeu basis, would require that each
bank advance principal based upon fixed percentages and receive principal reductions in a
similar fashion.

amounts over $26.5 million loaned to Venetian Bay as long as PNC's outstanding balance did

not exceed $10 million. (J-6). Specifically, Paragraphs 7 and 8 of the Participation Agreement

provide the following:

> 7. **PURCHASE AND SALE OF PARTICIPATION**. [Colonial] hereby
> sells to [PNC] and [PNC] hereby purchases from [Colonial] the excess
> loan amounts of all fundings over and above $26,500,000.00 based upon
> fundings drawn by [Venetian Bay] under the Loan Documents ("the
> Participation Amounts"). The respective amounts of the Loan to be held
> by [Colonial] and [PNC], based upon the full advance of the proceeds of
> the Loan, are:
> a. [Colonial's] Share: the first $26,500,000.00; and
> b. [PNC's] Share: all amounts funded or to be funded in excess of
> $26,500,000.00 (maximum of $10,000,000.00).
>
> 8. **PARTICIPATION PROCEDURE.**
> a. [PNC] shall purchase the Participation from [Colonial] as provided
> in Paragraph 7 above.

(J-6).

On August 23, 2006, PNC wired to Colonial its first funding payment under the

Participation Agreement in the amount of $8,913,920.27. (J-8). The parties determined this

amount by taking the outstanding balance of the loan on August 17, 2006 ($35,413,920.27) and

subtracting the $26.5 million portion that Colonial was required to fund, leaving a balance of

$8,913,920.27 to be funded by PNC. (J-55).

It is undisputed that after PNC's initial funding in August of 2006, Colonial failed to

administer the parties' participation in the loan on a LIFO basis for almost a year. Instead,

Michelle Fuller, Colonial's Vice President of Construction Loan Administration, testified that

Colonial mistakenly administered the parties' participation in the loan on a pro rata basis. Fuller

testified that very few of the loans in her construction administration department were

administered on a LIFO basis, and when PNC's loan participation information was manually

entered into Colonial's computer system, someone mistakenly designated the parties' participation as pro rata, with PNC's participation being designated as 27.397% of the loan.[5] (D-20). As a result, Colonial sought funding from PNC for 27.397% of the amounts of Venetian Bay's draw requests and Colonial remitted repayments from Venetian Bay to PNC for 27.397% of the amounts that Colonial collected.

This erroneous administration of the parties' participation can be seen by reviewing the loan transactions that occurred. For example, from August 2006 through September 19, 2006, Colonial collected $2,511,008.88 from Venetian Bay. (J-55; J-9). However, despite PNC's outstanding balance of almost $9 million, Colonial only remitted 27.397% or $687,947.55 to PNC. (J-55; J-9). Likewise, from September 6, 2006 through September 19, 2006, Colonial funded $1,778,181.19 in draw requests from Venetian Bay, but Colonial only sought funding from PNC for 27.397% of that amount or $487,172.93. (J-55; D-1). When it sought funding from PNC or was remitting payments to PNC for these amounts, Colonial gave PNC documentation showing how the amounts were calculated. (J-9; D-1). This documentation revealed that Colonial was only seeking funding from, and remitting payments to, PNC at 27.397%.[6] (J-9; D-1).

In July of 2007, it was discovered that Colonial was not administering the parties'

_____

[5]This percentage was calculated by dividing the $10 million maximum amount that PNC would fund by the $36.5 million maximum amount that could be loaned to Venetian Bay.

[6]The documentation for the September 26, 2006 remittance, November 7, 2006 funding request, January 9, 2007 remittance, January 18, 2007 funding request, April 26, 2007 funding request, and April 25, 2007 remittance also revealed that Colonial was only seeking funding from, and remitting payments to, PNC at 27.397%. (D-2; D-4; D-5; J-11; J-15). Likewise, the Participation Certificate for PNC's outstanding balance on November 7, 2006 reflects that PNC's participation was considered to be 27.397%. (J-14).

participation in the loan on a LIFO basis. As a result, on August 2, 2007, Jim Hogan from Colonial sent an email to John Long at PNC stating the following:

> . . . I have a slightly different proposal to make to you re: Venetian Bay. At the moment, due to [Colonial's] mis-administration of the loan and nothing that [PNC] did, [Colonial is] approximately [$873,000] over-funded on the current loan balance of [$36.5 million]. [Colonial has $27.373 million] outstanding and [PNC] has a balance of [$9.126 million]. Under our LIFO agreement, [Colonial] should have ceased funding at [$26.5 million] and [PNC] should have funded up to your limit of [$10 million].

> [Colonial] now ha[s] in hand funds to make a principal payment against the line of [$892,000]. I would like to propose to you that we apply [$873,000] of that amount against [Colonial's] principal to get [Colonial] back to our [$26.5 million] cap. The remainder, [$19,000] would come to [PNC] for principal reduction. Thereafter, until [PNC is] fully repaid, all principal repayments would come to [PNC]. Does that work for you? I would really like to redress [Colonial's] overlimit situation in this manner if possible.

(J-23). An hour later, John Long responded via email: "Okay to your proposal." (J-23).

As a result of this email communication, on August 3, 2007, Colonial remitted to PNC $19,669.69 of the $892,843.94 it received from Venetian Bay, which brought Colonial's outstanding loan balance to $26.5 million and PNC's outstanding balance to $9,107,156.06. (J-23; J-25). Therefore, on that date, the parties' participation balances were exactly what they should have been had their participation been properly administered using LIFO for funding and remittance from the very beginning. (Ex 1.2 to D-27).

Thereafter, when Colonial received the November 2, 2007 and December 6, 2007 principal repayments from Venetian Bay, Colonial remitted 100% of these amounts to PNC. (J-55). However, when Venetian Bay made a draw against the loan on December 12, 2007 for $1,079,138.78, Colonial initially sought funding from PNC for 27.397% of that amount, but about a week later, Colonial sought funding from PNC for the remainder. (J-55). Therefore, on

December 27, 2007, Colonial's outstanding loan balance was $26.5 million and PNC's outstanding balance was $9,142,758.72–exactly the amounts required under proper LIFO administration.  (J-55; D-27, Ex. 1.2).

On December 28, 2007, Venetian Bay made a draw against the loan for $832,837.42.  (J-55).  Colonial sought funding from PNC for the entire amount, but PNC refused to fund the draw.  (J-43).  Thereafter, Colonial received two more repayments from Venetian Bay totaling $130,000, and Colonial remitted the entire $130,000 to PNC.  (J-55).  As a result, PNC's remaining outstanding principal balance is $9,012,758.72.  (J-55; SF #26).

While Colonial concedes that it did not administer the parties' participation in the loan on a LIFO basis during the first year, Colonial argues that PNC waived any claims relating to Colonial's administration when PNC accepted Colonial's email proposal on August 2, 2007 to fix their loan balances.[7]  Additionally, Colonial argues, and its expert, James Cross, opined, that PNC did not suffer any damages as a result of Colonial administration of the loan.[8]  Cross explained that after Colonial remitted to PNC the partial amount of Venetian Bay's principal repayment on August 3, 2007 for the purpose of adjusting the parties' loan balances, the parties' balances were exactly what they should have been if their participation had been administered under LIFO from the very beginning.

PNC's expert, Ivan Hoffman, opined that PNC suffered $9,012,758.72 in damages[9] as a

_____

[7]The Court will address the issue of waiver in the Conclusions of Law section of this Order.

[8]The Court notes that John Long from PNC testified that PNC was paid all interest due to it under the Participation Agreement.

[9]This damages figure–$9,012,758.72–is PNC's outstanding loan balance today.

result of Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments, as required by their Participation Agreement. Hoffman opined that if Colonial had remitted to PNC 100% of Venetian Bay's principal repayments, then PNC would not have an outstanding balance today and would have been fully paid off.

PNC and Hoffman's theory is that PNC's damages are calculated by (1) determining the amount that PNC would have received had Colonial remitted to PNC 100% of Venetian Bay's principal repayments;[10] and (2) basing that calculation on the actual amount that PNC funded, without adjusting PNC's outstanding loan balance for the amounts that it would have funded had Colonial administered the loan on a LIFO basis from the beginning.

Hoffman's analysis and opinion regarding PNC's damages is flawed. Even if this Court accepted PNC and Hoffman's damages theory (which does not take into account the additional amounts that PNC would have funded if Colonial had administered the loan on a LIFO basis from the beginning)[11], Hoffman fails to properly account for the timing of the relevant transactions. Specifically, he fails to recognize that the timing of Venetian Bay's principal repayments, as well as the timing of PNC's funding, affect the amount of PNC's outstanding loan balance at any time, and PNC is only entitled to 100% of Venetian Bay's principal repayments when PNC has an outstanding balance that exceeded Venetian Bay's principal

---

[10]After reviewing Hoffman's chart within his expert report detailing amounts he believed that Colonial should have paid to PNC, it appears that he did not take into consideration whether PNC would have had an outstanding balance that exceeded Venetian Bay's principal repayment at the time each principal repayment was made. (P-14, p. 5). However, under the Participation Agreement, PNC is only entitled to 100% of the Venetian Bay's principal repayments as long as PNC's outstanding balance exceeds the amount Venetian Bay remitted.

[11]The Court will address this issue in the Conclusions of Law section of this Order.

repayment.

It appears that Hoffman merely adds up the amounts of principal repayments that Colonial collected from Venetian Bay from August 28, 2006 through September 23, 2008 (totaling $19,073,242.01) and compares that amount to the amount PNC actually funded ($14,865,378.87), and he determines that because Colonial collected an amount greater than the total amount funded by PNC, PNC's entire loan balance should have been paid off. However, as depicted in Exhibit 1 to this Order, when one actually goes through the transactions one by one to take in consideration the timing of each transaction, it is clear that even accepting PNC's theory for calculating damages, PNC would still have an outstanding balance of $1,711,346.01 today.[12]

### Golf Course Expenditures

In addition to filing suit over the administration of the parties' participation in the loan, PNC is also suing Colonial for allowing Venetian Bay to use the loan proceeds to pay for golf course expenditures, which PNC contends was in violation of an agreement between PNC and Colonial. While there is evidence that Venetian Bay did use some of the loan proceeds to pay for the golf course, there is no evidence of any written agreement restricting Venetian Bay's use of the loan proceeds.

---

[12]Even PNC's Vice President, Nancy Hauprich, took the timing of Venetian Bay's principal repayments and PNC's funding into account when calculating the amount she believed that PNC should have been paid, as well as PNC's outstanding balance, through July 2007. (D-11; J-22). She calculated PNC's outstanding balance through July 20, 2007 as being $2,630,957.44, and the Court calculated it as being $2,698,587.29. (D-11; J-22; Ex. 1 to this Order). While these amounts differ by more than $60,000, that is due in large part to Hauprich erroneously recording the date that PNC funded $62,711.08 as being on February 23, 2007 instead of March 23, 2007. (J-22).

Jerry Johnson, one of the Venetian Bay owners/developers, testified that from its inception, the development plan for the Venetian Bay community always contemplated the inclusion of a golf course.  The evidence admitted during the trial supports his testimony.

Construction of the Venetian Bay community was done in phases.  Colonial was the sole lender to Venetian Bay during its Phase 1A construction.  Phase 1A consisted of Venetian Bay acquiring 850 acres of land and developing it into 294 single family residential lots.  (P-4).  PNC entered into the Participation Agreement with Colonial in 2006 during Venetian Bay's Phase 1B construction.  Phase 1B consisted of developing 352 acres into 608 single family residential lots and 310 multi-family units.  (P-4).

On June 26, 2006, Darren Sweeney, PNC's lending officer, recommended that PNC enter into the Participation Agreement.  (P-6).  In the documents attached to Sweeney's loan recommendation, the proposed loan is described as loan participation between Colonial and PNC in order "to help fund the start of Phase 2 of the project."  (P-6, p. 1961).  Additionally, the loan description states that PNC's "participation has been requested to foster the continued growth of this project.  Further advances in this participation will fund the tail end of Phase 1B and the start of Phase 2 development."  (P-6, p. 1961).  Phase 2 is described as golf course lots and condominiums.  (P-6, p. 1963).

Also in June of 2006, one or more representatives from PNC visited the Venetian Bay project site.  (P-6, p. 1958).  At that time, construction of the golf course within the Venetian Bay community was underway.  (P-7).  Specifically, by August 9, 2006, golf course grading was 28% complete.  (P-7).

John Long of PNC testified that from the beginning, PNC knew that a golf course was

being constructed as part of the Venetian Bay community. However, Long contends that PNC was told that the golf course would be paid for by Venetian Bay's owners (Jerry Johnson, Sr. and Dipak Jobalia) out of their own pockets. Long testified that in March of 2006, there was an agreement between him and James Bange of Colonial that Colonial would not allow Venetian Bay to use any of the loan proceeds to pay for the golf course.

In August of 2006, Colonial and PNC entered into the Participation Agreement. There is no express provision in the Participation Agreement that prohibits Venetian Bay from using the loan proceeds for golf course expenditures.[13] (J-6). Likewise, there is no such restriction in the underlying loan agreement between Colonial and Venetian Bay. (J-1).

Long's testimony, as well as some of the emails admitted into evidence, support PNC's contention that PNC was told that none of the loan proceeds would be used to pay for golf course expenditures. Furthermore, there are some statements by Colonial in emails that were admitted into evidence that show that at least some people at Colonial were under the impression that PNC would reject Colonial's funding requests for golf course expenditures.

However, even if Bange did tell Long that Venetian Bay could not use the loan proceeds to pay for golf course expenditures, such a statement could not be relied upon by PNC due to the language in the Participation Agreement. Specifically, Paragraph 12 of the Participation Agreement provides that Colonial "does not make any express or implied warranty of any kind with respect to the Loan," and PNC "agrees and warrants that it . . . has not relied on any

---

[13]The Court notes that Paragraph 21 of the Participation Agreement contains the express restrictions agreed to by Colonial and PNC. (J-6). Nowhere in this paragraph is there any express restriction on funding Venetian Bay's golf course expenditures.

statement by [Colonial] in purchasing the Participation." (J-6). Additionally, Paragraph 29 of the Participation Agreement provides that "[e]xcept as otherwise expressly provided, this Agreement and the other Loan Documents embody the entire agreement and understanding between the parties hereto and supersede all prior agreements and understandings relating to the subject matter hereof." (J-6).

Jerry Johnson testified that Landirr, Inc. performed most of the work on the golf course. Johnson testified that he and his business partner, Dipak Jobalia, paid for the vast majority of the golf course expenditures out of their own pockets, totaling approximately $10 to $12 million, and that they only used two draws on the loan for golf course expenditures.

However, PNC's expert, Ivan Hoffman, opined that Venetian Bay used at least $5,806,592 of the loan proceeds to pay for the golf course. Hoffman explained in his expert report (P-14) and testified at trial regarding how he arrived at this amount, which was based on three types of evidence: (1) an April 11, 2007 site inspection report, (2) two emails, and (3) two screen prints from Colonial's computers.

Specifically, Hoffman opines that an April 11, 2007 site inspection report (P-10) shows that $1,044,937 of loan proceeds was spent on the golf course. Additionally, he opines that Colonial's representations in two emails (P-11, J-29) show that an additional $1.6 million of loan proceeds was spent on the golf course. Finally, he opines that screen prints from Colonial's computers (J-28; J-51) show that an additional $3,161,655 of loan proceeds was spent on the golf course. However, a closer review of this evidence reveals that his opinions are flawed.

The April 11, 2007 site inspection report shows that the site inspector concluded that the construction that occurred during the period was valued at $1,044,937. Venetian Bay did not

pay that amount, because a percentage for retainage was withheld. Instead, the report shows that the inspector approved the following payments for this work: $482,456.20 to be paid to Orion Construction and $468,715.92 to be paid to Landirr, Inc. Since Johnson testified that Landirr, Inc. did most of the golf course construction, the Court finds that this site inspection report supports the conclusion that the $468,715.92 paid to Landirr, Inc. was for golf course expenses. However, the Court finds that this site inspection report does not provide a sufficient basis for concluding that the $482,456.20 paid to Orion Construction was for golf course expenses.[14]

Hoffman also relied on two emails, which he believes support another $1.6 million in golf course expenditures. One of the emails, dated April 14, 2008, is from Michelle Fuller of Colonial, and in it she states that a draw was funded to pay Landirr, Inc. for the golf course. (P-11). She goes on to state that the site inspector's report's approved funding of $1,808,795.82, Colonial funded $1.6 million of that amount, and $666,971.22 of the $1.6 million was paid to Landirr, Inc. (P-11). The May 18, 2007 site inspector's report tracks these amounts. (P-11). The Court views this email as supporting the contention that the $666,971.22 paid to Landirr, Inc. was for the golf course, but the email and site inspector's report do not show that the remainder of the $1.6 million was used to pay for the golf course.

The other email, dated November 14, 2007, is from Jacques Coulliard of Colonial, and in it he states that the last draw "was mainly for golf course items." (J-29). The draw that he is referring to is Venetian Bay's draw of $1.6 million on May 21, 2007 (which is the same draw

---

[14]The site inspection report describes development and construction completed on the project during the period. However, this Court is not well-versed in the terms used to describe the work done and cannot determine from the site report alone whether the work described therein was for the golf course.

discussed in Fuller's April 14, 2008 email). However, the Court finds that his statement that the draw "was mainly for golf course items" is not sufficient to support the conclusion that the entire $1.6 million draw was used for the golf course. The Court will not make such an assumption. Therefore, the Court concludes that these two emails show that $666,971.22 of loan proceeds was used for the golf course.

Next, Hoffman relied on two screen prints from Colonial's computers to support his opinion that an additional $3,161,655 of loan proceeds was used to pay for the golf course. One of the screen prints shows that Colonial disbursed $500,000 on April 6, 2007 to Venetian Bay. (J-51). On the printout of the screen image, someone wrote "Portions of this draw are for golf course." (J-51). It is not clear as to who wrote that statement and what information that statement was based on. As such, the Court does not view that document as sufficient evidence that $500,000 was spent on the golf course.

The other screen print lists five transactions that appear to be golf course expenditures from June 12, 2006 through December 20, 2006 totaling $2,661,654.60. (J-28). Furthermore, other evidence admitted at trial supports the conclusion that the September 14, 2006 and December 20, 2006 amounts were golf course expenditures. (D-3, D-4, P-8, D-1). Therefore, the Court is satisfied that this document supports the conclusion that an additional $2,661,654.60 was used to pay for the golf course.

Accordingly, the Court finds that the April 11, 2007 site inspection report shows that $468,715.92 in loan proceeds were used for golf course expenditures; the emails of Fuller and Coulliard, along with the May 21, 2007 site inspector's report, show that $666,971.22 of loan proceeds were used for the golf course; and Colonial's screen print shows that an additional

14

$2,661,654.60 was used for golf course expenditures. Therefore, the Court rejects Hoffman's opinion that golf course expenditures exceeded $5.8 million, and instead, the Court finds that PNC has shown that Venetian Bay used $3,797,341.74 of loan proceeds to pay for the golf course.

## Claims Remaining in this Lawsuit

The underlying loan agreement between Colonial and Venetian Bay expired on February 3, 2008. (J-2). However, Venetian Bay did not pay off the loan balance, and as a result, the outstanding principal balance due to PNC is $9,012,758.72. (J-55; SF #26).

On April 1, 2008, PNC filed suit against Colonial for repayment of the amounts owed to it under the Participation Agreement. In its complaint, PNC asserted four claims: (1) breach of contract, (2) a claim that Colonial's failure to remit 100% of all of Venetian Bay's principal repayments constituted gross negligence, bad faith, or willful misconduct[15], (3) conversion, and (4) breach of trust and fiduciary duty. (Doc. No. 1). In response, Colonial moved to dismiss the complaint. (Doc. No. 10).

After the Court's Order granting Colonial's motion to dismiss in part (Doc. No. 22), two claims remained against Colonial–the breach of contract claim and the claim that Colonial's failure to remit 100% of all of Venetian Bay's principal repayments constituted gross negligence,

---

[15]Paragraph 14 of the Participation Agreement provides that PNC is not barred from bringing certain tort claims against Colonial. Specifically, in Paragraph 14, the parties agree to the following: "[Colonial] shall not be liable under this Agreement to [PNC] for any action taken or omitted or for any error in judgment, except for [Colonial's] breach of this Agreement or its own gross negligence, bad faith or willful misconduct. [PNC] acknowledges that [Colonial's] obligations with respect to the Loan shall be no greater than the customary practices presently employed by [Colonial] in administering and servicing other loans covering commercial properties." (J-6).

bad faith, or willful misconduct.  In the breach of contract claim, PNC alleged that Colonial breached the Participation Agreement by (1) failing to remit to PNC all of Venetian Bay's principal repayments , (2) allowing Venetian Bay to use loan proceeds to pay for golf course expenditures, and (3) waiving late fees without PNC's consent.  There was very little evidence during the trial regarding Colonial's alleged waiver of late fees without PNC's consent, and as a result, the Court deems that portion of PNC's breach of contract claim to be abandoned.[16]

## II.  Conclusions of Law[17]

The issues of law that remain to be determined are the following: (1) whether PNC waived its right to assert a breach of contract claim relating to Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments; (2) whether PNC suffered any damages due to Colonial's breach of the Participation Agreement's provision that Colonial remit to PNC 100% of Venetian Bay's principal repayments; (3) whether Colonial's failure to remit 100% of Venetian Bay's principal repayments constituted gross negligence, bad faith, or willful misconduct; and (4) whether any binding agreement existed between Colonial and PNC regarding prohibiting Venetian Bay from using the loan proceeds for the golf course after they entered into the Participation Agreement.  The Court will address each of these issues in turn.

---

[16]If the Court did not deem this portion of the breach of contract claim to be abandoned, the Court would find in favor of Colonial on the claim, because PNC did not submit sufficient evidence to sustain such a claim.

[17]The parties agree that Florida law applies to this case.  (Doc. No. 63, p. 26).

**A.  Waiver**[18]

Colonial has argued that PNC waived its right to assert a breach of contract claim relating to its failure to remit to PNC 100% of Venetian Bay's principal repayments.  Specifically, Colonial contends that PNC's August 2, 2007 acceptance of Colonial's proposal for resolving the miscalculation of their loan balances due to Colonial's failure to administer their participation in the loan on a LIFO basis constituted a waiver of any claims PNC may have had relating to Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments. Additionally, Colonial argues that the fact that PNC continued to fund the draws and accept principal repayments after PNC discovered Colonial's mis-administration of the loan in August of 2007 is further evidence of PNC's waiver.

"Under Florida law, waiver is the voluntary and intentional relinquishment or abandonment of a known and existing right or privilege which, except for the waiver, the party would have enjoyed."  Pajcic v. Am. Gen. Life Ins. Co., 419 F. Supp. 2d 1380, 1382 (M.D. Fla. 2006) (citation omitted).  Waiver can be established through express language or implied by conduct that clearly leads a party to believe that a right has been waived.  See id.; American Somax Ventures v. Touma, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989).  However, mere delay is insufficient to establish waiver.  See Goodwin v. Blu Murray Ins. Agency, Inc., 939 So. 2d 1098, 1104 (Fla. 5th DCA 2006)(citations omitted).

The Court agrees with Colonial that PNC's conduct amounted to a waiver of its right to

---

[18]The Court notes that whether a waiver has occurred is generally a question of fact.  See Pajcic v. Am. Gen. Life Ins. Co., 419 F. Supp. 2d 1380, 1383 (M.D. Fla. 2006)(citation omitted). However, because the Court is citing cases to support its factual finding of waiver, the Court has set forth its analysis of the issue of waiver under the Conclusions of Law section of this Order.

seek remittance of 100% of Venetian Bay's principal repayments that Colonial collected prior to August 3, 2007.[19]  It was apparent from the very beginning that Colonial was not seeking 100% of the funding from, or remitting 100% of the principal repayments to, PNC, and PNC agreed to Colonial's proposal to resolve these errors on August 2, 2007 via email.

In its August 2, 2007 email, Colonial stated that it was making a proposal to redress its mis-administration of the loan by remitting to PNC only a small portion of Venetian Bay's July 23, 2007 principal repayment in order to bring their loan balances to the amounts that they would have been had the loan been administered on a LIFO basis from the beginning.  PNC accepted this proposal without objection, even though the proposal meant that PNC was consenting to receiving less than 3% of Venetian Bay's July 23, 2007 principal repayment.  In agreeing to Colonial's proposal, PNC relinquished its right to demand remittance of 100% of all principal repayments that Venetian Bay made prior to August 3, 2007.  In fact, there is no evidence that PNC ever complained about not receiving 100% of the principal repayments that Venetian Bay made prior to August 3, 2007, nor did PNC seek remittance of such amounts, until after Venetian Bay defaulted on the loan in February of 2008.  Therefore, the Court finds that PNC's acceptance of Colonial's August 2, 2007 proposal, as well as PNC's failure to object to Colonial's partial remittance of principal repayments during the year-and-a half that they funded the loan together prior to Venetian Bay's default, constitutes clear evidence of PNC's waiver. See Arbogast v. Bryan, 393 So. 2d 606 (Fla. 4th DCA 1981)(finding that the plaintiff waived his right to seek full payment of his commissions due to his knowing failure to object to the

---

[19]There is no dispute that Colonial remitted 100% of Venetian Bay's principal repayments after August 3, 2007.

payments of a lesser amount for a substantial period of time); Touma, 547 So. 2d at 1268-69 (finding that the plaintiffs' recognition of the continued existence of the contract after the alleged breach constituted waiver of the breach). Accordingly, the Court finds that Colonial is entitled to judgment on PNC's breach of contract claim relating to Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments.

**B. Damages**

Even if the Court had not found that PNC waived its right to seek remittance of 100% of Venetian Bay's principal repayments, PNC's breach of contract claim would still fail because it did not suffer any damages. The fact of the matter is that PNC is in the same position today as it would have been in had Colonial administered the parties' participation in the loan on a LIFO basis from the beginning, as required by the Participation Agreement.

Damages for a breach of contract should put the plaintiff in the same position it would have been in had the defendant not breached the contract. See Capitol Environmental Services, Inc. v. Earth Tech, Inc., 25 So. 3d 593 (Fla. 1st DCA 2010)(citation omitted). In this case, the breach was Colonial's failure to administer the parties' participation in the loan on a LIFO basis. As such, the breach consisted of both (1) Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments, and (2) Colonial's failure to have PNC fund 100% of Venetian Bay's draw requests. While PNC cleverly tries to rephrase the breach as simply Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments, the measure of PNC's damages requires a consideration of both the losses PNC suffered (i.e., principal repayments it did not receive) as well as the losses PNC avoided (i.e., draw requests that it did not have to fund, despite being obligated under the Participation Agreement to fund all amounts loaned over

$26.5 million).  If the Court considered only the principal repayments that PNC did not receive (without also considering the funding that PNC avoided) as the measure of PNC's damages, PNC would receive a windfall.

Furthermore, if the Court accepted PNC's theory that its damages equal the amount of principal repayments that it did not receive (without consideration of the funding PNC was not required to undertake), the Court would be ignoring the purpose of the Participation Agreement. PNC's expert, Ivan Hoffman, testified that the purpose of requiring that the parties' participation in the loan be administered on a LIFO basis was to reduce PNC's exposure to the risk of Venetian Bay defaulting on the loan by requiring that PNC be repaid before Colonial was repaid. As such, the Court finds that the purpose of the provision in the Participation Agreement that PNC receive 100% of Venetian Bay's principal repayments was to compensate PNC for the risk it was undertaking by funding 100% of the loan amount in excess of $26.5 million.

However, Colonial administered their participation in the loan on a pro rata basis through August 2, 2007, which resulted in Colonial remitting principal repayments to, and seeking funding for Venetian Bay's draw requests from, PNC at 27.397%.  Due to Colonial's mis-administration of their participation in the loan, PNC was not exposed to the same level of risk that the parties' contemplated in the Participation Agreement, which is a fact that must be recognized when measuring PNC's damages from Colonial's mis-administration.

Additionally, the Court notes that Colonial and PNC's August 2, 2007 agreement to disburse Venetian Bay's July 23, 2007 principal repayment could be viewed as an implicit setoff of the following amounts: (1) the July 23, 2007 principal repayment of $892,843.94, (2) the additional amount of principal repayments due to PNC (totaling $12,347,447.61 prior to Venetian Bay's July 23, 2007 principal repayment[20]), and (3) the amount of additional funding

---

[20]See Exhibit 2 attached to this Order.

required of PNC[21] (totaling $13,220,621.86[22]) under the Participation Agreement. After the implicit setoff of the $12,347,447.61 of principal repayments due to PNC and the $13,220,621.86 of additional funding required of PNC under the Participation Agreement, PNC would still have been required to fund an additional $873,174.25. Therefore, when disbursing Venetian Bay's July 23, 2007 principal repayment of $892,843.94, the parties implicitly agreed to set off that amount by the $873,174.25 of additional funding that PNC would have been required to make, which resulted in Colonial remitting only $19,669.69 of Venetian Bay's July 23, 2007 principal repayment to PNC.

When viewed in that manner, PNC was effectively paid all amounts collected from Venetian Bay through August 3, 2007, less the amount of additional funding that Colonial would have requested from PNC on that date due to Colonial's recognition that it failed to request 100% funding from the beginning of the loan. Thus, as previously stated, after August 3, 2007, PNC was in the same position that it expected to be in when it entered into the Participation Agreement, and as a result, it did not suffer any damages from Colonial's mis-administration of their participation in the loan. Therefore, the Court finds that Colonial is entitled to judgment on

---

[21]It appears that PNC has argued that there is no evidence that it would have been required to fund these additional amounts, because under Paragraph 6 of their Participation Agreement, Colonial was required to give PNC notice that all conditions precedent to the funding had been satisfied. Thus, PNC appears to argue that there is no proof that such conditions were satisfied, thereby precluding a finding that PNC would have been required to fund the additional amounts. However, such an argument makes no sense, because the funding requests that Colonial actually made were based on the exact same expenditures that the additional funding request would be based on, since the additional funding request would simply be seeking the remaining 72.603% (100% required to be funded by PNC, minus 27.397% actually funded by PNC) of required funding for Venetian Bay's draw requests from August 2006 through August 2, 2007.

[22]See Exhibit 3 attached to this Order.

PNC's breach of contract claim relating to Colonial's failure to remit to PNC 100% of all

principal repayments.

### C. Gross Negligence, Bad Faith, and Willful Misconduct

Next, Colonial argues that its failure to remit to PNC 100% of all of Venetian Bay's

principal repayments did not constitute gross negligence, bad faith, or willful misconduct.[23]  The

parties have stipulated to the following definitions for gross negligence, bad faith[24] and willful

misconduct:

> [A finding of gross negligence] requires a showing of (1) the existence of a
> composite set of circumstances that, taken together, constitute imminent or clear
> and present danger amounting to more than normal and usual peril; (2) chargeable
> knowledge or awareness of the imminent or clear and present danger; and (3) the
> act or omission complained of must occur in a manner which evinces a conscious
> disregard of the consequences, as distinguished from a careless disregard (as in
> simple negligence) or from willful or wanton disregard (as in culpable or criminal
> negligence).
>
> Good faith means honesty in fact and the observance of reasonable commercial
> standards of fair dealing, . . . [and it] assures that neither party acts in a manner
> that destroys the rights or interests of the other party to an agreement.

_____

[23]The Court notes that in its Proposed Findings of Fact and Conclusions of Law, PNC
analyzes its gross negligence/bad faith/willful misconduct claim as if it is based on Colonial's
conduct in allowing Venetian Bay to use the loan proceeds on golf course expenditures.  (Doc.
No. 71, p. 20).  However, the allegations in the complaint show that PNC asserted this claim
based on Colonial's failure to remit to PNC 100% of Venetian Bay's principal repayments.
Specifically, PNC alleges in its complaint that "Colonial's intentional withholdings of payments
received from Venetian Bay that should have been paid to [PNC] constituted gross negligence,
bad faith or willful misconduct."  (Doc. No. 1, ¶ 21).  As such, the Court will analyze this claim
as being based on Colonial's failure to remit to PNC 100% of Venetian Bay's principal
repayments.  However, even if this claim was also based on Colonial's conduct in allowing
Venetian Bay to use the loan proceeds on golf course expenditures, the Court would still find in
favor of Defendant on this claim.

[24]The parties did not stipulate to a definition for bad faith, but instead, they stipulated to a
definition of good faith.  The Court presumes that they are therefore stipulating to the definition
that bad faith occurs in the absence of good faith.

> [A finding of willful misconduct] requires a showing of (1) intentional
> performance of an act knowing that the act likely would result in injury or
> damage; (2) an action taken with "reckless disregard" of the consequences; or (3)
> a deliberate failure to discharge a duty necessary to safety.

(Doc. No. 63, p. 27-28)(internal citations omitted).

The evidence in this case does not support a finding of gross negligence, bad faith, or willful misconduct. Colonial's conduct was a result of it mistakenly classifying the parties' participation in the loan as being on a pro rata basis instead of a LIFO basis. Michelle Fuller, Colonial's Vice President of Construction Loan Administration, testified that very few of the loans in her construction administration department were administered on a LIFO basis, and when PNC's loan participation information was manually entered into Colonial's computer system, someone mistakenly designated the parties' participation as pro rata. As such, Colonial mistakenly remitted partial principal repayments to PNC, and there was no evidence that Colonial ever intentionally withheld any of the principal repayments. Therefore, the Court finds that Colonial's failure to remit to PNC 100% of all of Venetian Bay's principal repayments was a mistake that amounted to mere negligence, which is not sufficient to support PNC's claim. Accordingly, the Court finds in favor of Colonial on PNC's claim that Colonial's failure to remit to PNC 100% of all of Venetian Bay's principal repayments constituted gross negligence, bad faith, or willful misconduct.

### D. Golf Course Expenditures

The Court previously found that PNC had shown that Venetian Bay used $3,797,341.74 of loan proceeds to pay for the golf course. However, Colonial argues that such is of no consequence, because there was no binding agreement between Colonial and PNC after they

entered into the Participation Agreement that prohibited Venetian Bay from using the loan proceeds for the golf course. The Court agrees.

John Long of PNC testified that an oral agreement existed between Colonial and PNC regarding the use of the loan proceeds for golf course expenditures. Specifically, Long testified that prior to entering into the Participation Agreement, James Bange of Colonial told him that Venetian Bay could not use the loan proceeds to pay for golf course expenditures. Even if the Court accepts that such an oral agreement existed prior to the parties entering into the Participation Agreement, the Court finds that the alleged oral agreement to restrict the use of the loan proceeds is unenforceable due to the merger clause contained in Paragraph 29 of the Participation Agreement.[25] See Rodriguez v. Tombrink Enterprises, Inc., 870 So. 2d 117, 119 (Fla. 2d DCA 2003)(concluding that the plaintiffs could not enforce the alleged oral agreement due to the existence of a final written contract containing a merger clause); Comsof , N.V. v. Cigarette Racing Team, Inc., 2002 WL 227034, at *3 (S.D. Fla. Jan. 25, 2002)(stating that the existence of the merger clause in the parties' contract precluded enforcement of the parties' alleged oral agreement).

Furthermore, if such a restriction was as important to PNC as PNC argues that it was, the Court would expect to find the restriction expressly included within the Participation Agreement and/or a document given to Venetian Bay regarding the permissible use of the loan proceeds. However, there is no express written restriction regarding the use of the loan proceeds for golf

---

[25]Paragraph 29 of the Participation Agreement provides that "[e]xcept as otherwise expressly provided, this Agreement and the other Loan Documents embody the entire agreement and understanding between the parties hereto and supersede all prior agreements and understandings relating to the subject matter hereof." (J-6).

course expenditures in any of the loan documents or the Participation Agreement. Instead, Paragraph 2.1(e) in the underlying loan document expressly provides the following regarding use of the loan proceeds:

> . . . [Loan proceeds can be used for] reimbursement of development and soft costs . . . incurred by [Venetian Bay] in connection with its proposed development on the Property, for construction costs and expenses incurred by [Venetian Bay] in connection with its improvement of the Property[,] and for such other costs, expenses and purposes as may be authorized by [Colonial], including (if approved by [Colonial] in its sole discretion) purposes relating to properties of [Venetian Bay] or its affiliates other than the Property.

(J-1).

The Court finds that Venetian Bay's use of the loan proceeds to pay for golf course expenditures was explicitly authorized under Paragraph 2.1(e), as those expenditures were costs incurred in connection with the proposed development and/or construction expenses incurred in connection with the improvement of the property. However, even if the golf expenditures were not initially contemplated to be paid for with the loan proceeds, the loan agreement provides that the loan proceeds could be used for non-contemplated costs and purposes if Colonial authorized such use (and it is clear that Colonial approved of using the loan proceeds to pay for the golf course, as it approved draw requests to fund golf course expenditures).

Accordingly, the Court finds that there was no enforceable agreement in existence between Colonial and PNC after they entered into the Participation Agreement that prohibited Venetian Bay from using the loan proceeds for golf course expenditures. Since there was no enforceable agreement that Colonial could breach, the Court finds in favor of Colonial on PNC's breach of contract claim relating to the golf course expenditures.

### III.  Conclusion

Accordingly, the Court finds in favor of Defendant on PNC's breach of contract claim and on PNC's gross negligence, bad faith, or willful misconduct claim.  As such, the Clerk is directed to enter judgment in favor of Defendant.  The Court **DENIES AS MOOT** Defendant's motion for judgment as a matter of law (Doc. No. 83).  The Clerk is directed to **CLOSE** this case, and the closing of this case will not affect the Court's ability to hear and determine any motions for attorneys' fees and costs and other post-trial motions.

**DONE AND ORDERED** at Tampa, Florida, this 8th day of March, 2010.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record